# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**NATIONWIDE AGRIBUSINESS**
**INSURANCE COMPANY,**

        Plaintiff,

**FRANSISCO ALCALA,**

        Involuntary Plaintiff,

    -vs-                                                   Case No. 12-C-1227

**MELLER POULTRY EQUIPMENT, Inc., and**
**MELLER ANLAGENBAU GMBH,**

        Defendants.

## DECISION AND ORDER

Fransisco Alcala fell from a catwalk in a chicken coop at the Cold Spring Egg Farm facility in Palmyra, Wisconsin, sustaining serious injuries. Alcala and Cold Spring's workers' compensation provider, Nationwide Agribusiness Insurance Company, seek recovery from Meller Anlagenbau GmbH, the company that manufactured and installed the chicken coop. Plaintiffs bring claims for strict liability, negligence, and breach of the implied warranties of workmanship, merchantability, and fitness for a particular purpose.

Meller moves for summary judgment and to exclude the expert

opinions and testimony of Michael Wright, a civil engineer who opined that the catwalk was defective. Wright's testimony meets the threshold requirements of relevance and reliability under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Therefore, Meller is not entitled to summary judgment on plaintiffs' negligence and strict liability claims. However, Meller's motion is granted with respect to the warranty claims.

## BACKGROUND

Meller is a German corporation that has been making chicken coops for over 30 years. In 2004, S&R Egg Farm, Inc. or Cold Spring Egg Farms, Inc. (S&R, collectively) purchased chicken coops from Meller. S&R purchased the chicken coops for a new barn being built at the Cold Spring facility in Palmyra known as Barn 10. Meller did not construct the building for Barn 10 (it was built by a non-party, Henning Construction).

The chicken coops installed in Barn 10 consist of 10 modules of chicken cages (11 aisles), each comprised of eight tiers of chicken cages. Additionally, in each aisle, a catwalk is installed between the fourth and fifth tiers of cages, resulting in a two-story chicken coop.

Meller's catwalks are made of metal. Metal gratings are placed inside and between two metal "angles" (L-shaped brackets or channels) that are secured by bolts on the horizontal flanges of the angles to supports

connected to the caging modules on either side of the aisle.

Alcala was employed as a barn worker at the Cold Springs farm. Alcala was responsible for cleaning barns and taking care of the birds. Alcala weighed at least 320 pounds at the time of his accident, placing him in the 97th percentile of workers.[1] Alcala usually did not work in Barn 10, but on May 8, 2011, the day of the accident, Alcala and about 20 of his coworkers were asked to report to Barn 10.

S&R was putting the birds in Barn 10 through a "molting" phase by, among other things, restricting the birds' diets. While molting, the birds cease egg production and begin shedding feathers. S&R molts its birds to extend the "productive" egg laying life of the birds. Molting is illegal in Germany and in Europe, where Meller is located, because it violates animal protection laws.

As the birds lose their feathers, the feathers collect in a feed belt that runs along the cages. S&R requires its barn workers to manually remove the feathers from a feed belt using their hands. S&R has no written policies or procedures regarding this practice. To perform this task, the barn workers were positioned at either end of the aisles in Barn 10. Barn

---

[1] Alcala's weight was recorded as 250 pounds by the hospital on the day of the accident. This factual dispute is irrelevant to the Court's analysis herein.

10 has 11 aisles, so there were approximately 22 barn workers in Barn 10 on the day of Alcala's accident. Although there were eight tiers of cages (four on the ground floor and four on the second-story), the barn workers could only pick feathers from the feed belts of two tiers at a time. They started at the top and worked their way down. They changed positions to the next lower two tiers about every 20 to 30 minutes. This process, which occurs daily over a period of several weeks, takes about two-and-a-half hours to complete.

In order to be more comfortable, the barn workers sometimes placed wooden boards across the aisles so they could sit on this platform while cleaning feathers. When removing feathers from the top two feed belts, the barn workers placed the board at the level of the second-highest highest tier, which Alcala said was at least chest-high. S&R's barn workers have been doing this since at least 1994, and S&R's management and ownership was aware of the practice.

Alcala walked to the rear of Barn 10, grabbed a board, and went to aisle number five. He placed the board crosswise in the aisle, resting it on the cages, at the third or fourth tier up, i.e., the top two tiers, either chest-high or head-high. Alcala then climbed up the side of the chicken cages and transferred himself to a sitting position on the board. After cleaning

feathers from the top two tiers for about 20 or 30 minutes, Alcala started climbing down the cages. During his deposition, Alcala testified that he slipped while climbing down and fell, that he somehow came into contact with the metal catwalk grate, and that he landed on the barn's concrete floor. In his interrogatory answers, Alcala stated that the metal scaffolding "collapsed" as he was walking on it, causing him to fall to the floor below.

Alcala was taken to Froedtert Memorial Lutheran Hospital by Flight for Life. Alcala suffered a left tibial fracture, an open complex bimalleolar fracture of the right ankle, a compression fracture at L1 and degenerative changes from T12 to L1 and L2. The left tibial plateau fracture and the open complex bimalleolar fracture of the right ankle required open reduction and internal fixation with plates and screws and intramedullary nailing. In addition, Alcala's injuries will cause his knees to become arthritic, requiring a total knee anthroplasty, and his ankle will require a subtalar fusion.

## ANALYSIS

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003).

## I. Strict liability and negligence

Plaintiffs argue that Meller's catwalk contains manufacturing, design, and warning defects. A product contains a manufacturing defect if the product "departs from its intended design even though all possible care was exercised in the manufacture of the product." Wis. Stat. § 895.047(1)(a).[2] A product contains a design defect if "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe."

---

[2] Wisconsin law applies in this diversity case. § 895.047 applies to strict products liability claims that are commenced on or after February 1, 2011. 2011 Wis. Act 2, § 45(5).

*Id.* A product is defective because of "inadequate instructions or warnings only if the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe." *Id.* Plaintiffs must also show that the defective condition rendered the product unreasonably dangerous to persons or property; that the defective condition existed at the time the product left the control of the manufacturer; that the product reached the user or consumer without substantial change in the condition in which it was sold; and that the defective condition was a cause of the claimant's damages. § 895.047(1)(b-e).

A claim of strict products liability "is much like a negligence claim because it requires proof either that the product was unreasonably dangerous or, what amounts to the same thing, that it was defective." *Krien v. Harsco Corp.*, 745 F.3d 313, 317 (7th Cir. 2014). To succeed on a claim of negligence, the plaintiffs must prove the existence of a duty of care on the part of the defendant, breach of that duty of care, a causal connection between the defendant's breach and the plaintiff's injury, and actual loss or damage resulting from the injury. *Gritzner v. Michael R.*, 611 N.W.2d 906, 912 (Wis. 2000). Negligence-based liability arises when the

seller of a product breaches the duty of reasonable care in designing or manufacturing the product. *Komanekin v. Inland Truck Parts*, 819 F. Supp. 802, 808 (E.D. Wis. 1993). In the negligence context, the reasonableness of a product's design "turns essentially on whether the seller could have come up with a less dangerous design." *Id.*

Meller argues that the plaintiffs need expert testimony to survive summary judgment on these claims. Thus, Meller's motion is presented in tandem with its motion to exclude the expert opinion and testimony of Michael Wright, a civil engineer who opined that "the cause or causes of [Alcala's] injuries are from the defects in the design, manufacturing, instructions and installation" of the platform in the chicken coop. ECF No. 76-23 (Exhibit W, Wright Report). Meller's request for summary judgment on these claims therefore rises and falls on its accompanying *Daubert* motion.

The Court is not entirely persuaded that the plaintiffs need expert testimony to proceed to trial. "Before expert testimony is held to be a prerequisite, it must be found that the matter is not within the realm of ordinary experience and lay comprehension." *White v. Leeder*, 440 N.W.2d 557, 562 (Wis. 1989). As the Court has commented in previous orders, a catwalk should not collapse under the weight of one man. *See, e.g., Bruss v.*

*Milwaukee Sporting Goods Co.*, 150 N.W.2d 337 (Wis. 1967) (no expert testimony required in negligence action by students injured in collapse of folding bleachers in high school gymnasium); *Sumnicht v. Toyota Motor Sales, USA, Inc.*, 360 N.W.2d 2, 18 (Wis. 1984) (in a strict liability case, evidence of a malfunction "is one type of circumstantial evidence that can be used in establishing a defective condition"). However, it is not necessary to proceed with this line of inquiry because Wright's testimony is admissible at trial.

## II. *Daubert* motion

Rule 702 of the Federal Rules of Evidence requires the Court to perform a "gatekeeping" function before admitting expert scientific testimony in order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The Court must make the following inquiries: first, the expert must be qualified by knowledge, skill, experience, training, or education; second, the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case. *Lees v. Carthage College*, 714 F.3d 516, 521-22 (7th

Cir. 2013). With regard to reliability, the Court considers a non-exhaustive list of guideposts, including whether the scientific theory can be or has been tested, whether the theory has been subjected to peer review and publication, and whether the theory has been generally accepted in the relevant scientific, technical, or professional community. *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) (citing *Daubert* at 593-94).

A *Daubert* inquiry "is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Daubert* at 596).

Wright has 35-plus years of professional experience as a structural engineer, safety engineer, construction engineer, certified safety professional, certified plant engineer, and expert witness. He is the President of a company called Safety Through Engineering, Inc. Meller does not challenge Wright's credentials, and the Court finds that he is qualified to render an expert opinion in this case.

Wright described his methodology as follows:

> I'm not sure every little detail, but in general terms I reviewed the photos, my site information taken by the photos. I reviewed the depositions. I reviewed the witness statements. I reviewed the exhibits. I reviewed Wisconsin Building Code, International Building Code, all the items that I've listed in my report of March 27, 2014, and did calculations and made those opinions based on my years of experience as a structural engineer and safety engineer, working with millwrights my entire 35 years, and understood by reading the depositions and being present, I understood and could – in my mind's eye could see what was happening. Also, from my original site inspection, I had my opinion based on the angle geometry and connection of the angle what most likely happened.

Wright Dep. at 71-72.

Wright opines that as Alcala came into contact with the grate, the angle support nearest the cage where Alcala climbed down rotated toward the grate, allowing the grate to fall through. "It is my opinion that the two structural edge angles failed to be properly and adequately braced to be able to resist the twisting effects and the gravity loading effects caused by the normal foreseeable floor loading on the subject floor grating at the time of the accident." Report at 11. According to Wright's calculations, the angle was "unstable and couldn't support the load" and "the degree of angle rotation was enough to relieve that grating and let it fall." Wright Dep. at 169-70.

Meller argues that Wright lacked a reasonable scientific methodology to support his opinion about how the accident occurred. Meller's argument consists of picking and choosing isolated portions of Wright's Expert Report and deposition testimony to suggest that Wright simply assumed that the platform was defective. *See Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007) ("an expert does not assist the trier of fact in determining whether a product failed if he starts his analysis based upon the assumption that the product failed (the very question that he was called upon to resolve)"). To the contrary, Wright's opinions are grounded in scientific methodology; he did not simply look at the angle and declare it defective.

For example, consider the following elaboration in Wright's testimony:

> A: The angle is outside of industry practice and codes because it's not connected on the vertical leg and because it can't take the required loads of the building and because it can't take the required loads of the building code or ACSE loads. And it rotates, and it opens up, and the person falls through and it closes back up. It rotates in a plastic – or elastic mode so it goes right back.
>
> Q: … That's what you're trying to calculate on this Exhibit Number 11 here?
>
> A: Yes. It's based on Exhibit Number 5. And I made

> reference in the – in the calculation.
>
> Q: But you were unable to do the calculation to lead to any specific conclusion; is that correct?
>
> A: No.
>
> Q: So tell me the … conclusion that you were –
>
> A: It's inadequate.
>
> Q: I thought you said you couldn't perform the calculation.
>
> A: The calculation assumes – I showed you hours ago that you have to prevent angle rotation. I showed you that in this standard. So automatically it fails. So then I took the calculation one step farther and said, okay, let's assume that it's – the vertical leg is bolted on both ends, which it's not, and run the calculation again to see if it checks then, if they just have to go back and put bolts in. It still doesn't work.

Wright Dep. at 161-63. Moreover,

> A: From a structural engineering point of view, what happened is the angle is unbraced, upper vertical leg is not connected to the supporting channels at either end, nor is the upper leg of the supporting channel supported, braced, for its entire length of the 62 and 5/8 – or 5/6 – 5/8 length.
>
> So, therefore, the top flange is not braced horizontally whatsoever for its entire length, which is against the design – AISC design standards, and you can't get a safe load determination from it.
>
> But what happened is when a load was applied in that area, the angle cannot resist that load properly and it doesn't deflect. It rotates..

> So deflection is not an issue. It's the rotating inward towards the catwalk. Top flange rotates inward towards the catwalk. Bottom flange goes down and rotates because it's a rigid body.
>
> And just from that phenomena of the top flange going in, the bottom flange coming out, it actually slips off – the grating actually slips off the angle, and thereby the person would fall through.
>
> And by the person falling through, the body function would create friction on the angle – or on the grating, and the grating would follow thereafter on top of the person.
>
> And since the rotation stresses, the torsional – latter torsional buckling stresses of the angle was below yield, it would basically pop back into place like a rubber band, elastic, and it would not show signs of being overstressed. Because in fact it wasn't overstressed; it was unstable.
>
> So that's my opinion of what happened. And I showed you documents creating that's exactly the issue.

*Id.* at 262-63. There is more, but the Court will not belabor the point. Wright's opinion is not the dreaded "*ipse dixit*," or "because I say so." *General Electric v. Joiner*, 522 U.S. 136, 146 (1997).

Meller further argues that Wright's opinions are unreliable because he did not design, build and test any proposed alternative designs or proposed warnings. "Testing is certainly one of the most common and useful reliability guideposts for a district court when contemplating

proposed Rule 702 evidence. But physical re-creations of industrial accidents are not always feasible or prudent." *Lapsley*, 689 F.3d at 815. Wright's calculations are simply another form of testing. *Id.* ("A mathematical or computer model is a perfectly acceptable form of test"); *see also Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996) ("We do not mean to suggest, of course, that hands-on testing is an absolute prerequisite to the admission of expert testimony"). Bolting the vertical flange (as advised by Wright and the industry standard) is an alternative design that would render the catwalk safer than Meller's design. Wright's calculations, however, revealed that even with the vertical flange bolted, the catwalk would still be unable to support its intended load. Thus, Wright proposes that a box, I-beam support, or bracing underneath the grating should be added to the structure. Wright built such structures "numerous times" over his years of experience, and there was no need to "calculate it again." Wright Dep. at 431-32.[3] This methodology is not unreliable under *Daubert*.

Meller also argues that Wright's opinions are unreliable because he found no evidence of a manufacturing defect. This is a mischaracterization

---

[3] Moreover, S&R added steel anti-expansion bars underneath the grating of all Meller catwalk systems in all of its barns immediately following the accident. Thus, Wright's alternative design has been tested on a daily basis at S&R following the Alcala accident.

of Wright's testimony. "Since I don't have the drawings, I can't see if they performed what was required on the drawings so I can't distinguish if it was just a design defect or both [i.e., manufacturing]. If the design showed braces or bolts at the top angle, leg, I don't know because I don't have the drawings." Wright Dep. at 441. In fact, Wright did gather evidence of a manufacturing defect. For example, Wright observed during his inspection that nuts and bolts had fallen out of the Meller equipment onto the ground, and various witness-employees testified as such. Moreover, whether it was a design or manufacturing defect, Wright's testimony is admissible because it is undisputed that Meller designed, manufactured, supplied and oversaw the installation of the catwalk.

Finally, Meller argues that Wright's opinions are unreliable because he relied upon standards and regulations that are not applicable to this case or to Meller (e.g., OSHA, AISC, ACI, ANSI, NFPA, and the Wisconsin Building Code). Once again, the Court disagrees with Meller's characterization of Wright's testimony. Wright canvassed various industry standards and, based upon his expertise, explained which standards are relevant and which are not. For example, Wright explained that ACI (American Concrete Institute) standards applied in this case even though Meller did not make the concrete floor or build the building because it was

built specifically to house Meller's products. Wright Dep. at 104-120. Wright also rejected the contention that the AISC (American Institute of Steel Construction) manual is irrelevant because it is "the standard of the industry, and that angle was not designed by the standard of industry." Wright Dep. at 92. Ultimately, Meller's arguments about the inapplicability of various standards is the proper subject of cross-examination at trial.

### III. Breach of warranties

Plaintiffs' breach of warranty claims are barred by the six-year limitations period in the Uniform Commercial Code (as adopted in Wisconsin). Wis. Stat. § 402.725. Plaintiffs argue that the limitations period is three years running from the date of injury, Wis. Stat. § 893.54, but this statute (and the accompanying discovery rule) applies to tort claims, not claims sounding in contract. Plaintiffs object that the limitations period set forth in § 402.725 expired before Alcala was even injured, but this is not an anomalous or unfair result. *See Ogle v. Caterpillar Tractor Co.*, 716 P.2d 334, 350 (Wyo. 1986) ("it is worth noting that an injured plaintiff whose warranty action is barred by UCC § 2-725 can still bring an action in either negligence or strict liability").

The Court also agrees with Meller that the plaintiffs' claim for

breach of the implied duty of workmanship is duplicative of their negligence claim. *See Colton v. Foulkes*, 47 N.W.2d 901, 903-04 (Wis. 1951). To the extent that the plaintiffs intended this claim to sound in contract, it is either time-barred or fails for lack of privity. *City of LaCrosse v. Schubert, Schroeder & Assocs., Inc.*, 240 N.W.2d 124, 125-26 (Wis. 1976) (overruled on other grounds).[4]

## CONCLUSION

Meller's motion to exclude the opinions and testimony of Michael Wright [ECF No. 71] is **DENIED**. Meller's motion for summary judgment [ECF No. 73] is **GRANTED-IN-PART** and **DENIED-IN-PART**. The Court will conduct a telephonic status conference on **March 31, 2015** at **9:30 a.m. (Central Time)**, the purpose of which will be to set this matter for trial on the Court's calendar. The Court will initiate the call.

Dated at Milwaukee, Wisconsin, this 5th day of March, 2015.

        **SO ORDERED:**

        _/s/ Rudolph T. Randa_
        **HON. RUDOLPH T. RANDA**
        **U.S. District Judge**

---

[4] Indeed the lack of privity between the plaintiffs (Alcala and Nationwide) and Meller would seem to preclude recovery on any breach of warranty claim. *See, e.g, McLain v. Dana Corp.*, 16 S.W.3d 320, 326-27 (Kent. Ct. App. 1999); *Bruns v. Cooper Indus., Inc.*, 605 N.E.2d 395, 397 (Ohio Ct. App. 1992).